IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA     :
                             :        CRIMINAL INDICTMENT
v.                           :        NO.:  2:14-CR-0014-RWS-JCF
                             :
STACEY MALOCH                :

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Suppress Evidence (Doc. 17) and Motion To Suppress Statements (Doc. 18).  For the reasons discussed below, it is **RECOMMENDED** that Defendant's motions be **DENIED.**

## Background

An Indictment filed April 1, 2014 charges Defendant with possession with intent to distribute methamphetamine on March 13, 2013 and October 1, 2013 (Counts One and Two) and possession of a firearm by a convicted felon (Count Three).  (Doc. 1).  On May 12, 2014, Defendant filed the pending motions to suppress, seeking to suppress evidence seized during warrantless searches of Defendant's person and/or vehicle (Doc. 17) and statements made to law enforcement (Doc. 18).  The Court conducted a hearing on Defendant's motions on July 25, 2014.  (*See* Doc. 25).  The Government presented the testimony of Michael Stanifer, a deputy with the Jackson County Sheriff's Office, Trey McConnell, a narcotics investigator with the Jackson County Sheriff's Office, and

Jeffrey Shull, a narcotics investigator with the Hall County Sheriff's Office assigned to the Multi-Agency Narcotics Squad ("MANS"), and Defendant presented the testimony of her sister Kelly Wymore. (*See* Docs. 25, 29). At the hearing, Defendant challenged for the first time the October 1, 2013 search of her residence pursuant to a search warrant issued on that date, and she presented the testimony of Defendant's sister, Kelly Wymore, who testified that the search began prior to the officers obtaining the search warrant. At the end of the hearing, the Court indicated that it would keep the record open to allow the Government to submit a 9-1-1 dispatch log ("CAD report") to show what time the deputies and Ms. Wymore were at Defendant's residence and to allow Defendant to submit Ms. Wymore's cell phone records to support her testimony about what time she arrived at Defendant's residence. (*See* Tr. 89). On August 27, 2014, the Government filed a supplemental report of Investigator McConnell and the CAD report. (*See* Doc. 26). Defendant did not object to that filing, and she did not file Ms. Wymore's cell phone records. The transcript of the July 25, 2014 hearing was filed on October 9, 2014. (Doc. 29).[1] Defendant filed a post-hearing brief on November 26, 2014 (Doc. 33), and the Government filed a post-hearing brief on January 28, 2015 (Doc. 37). Although Defendant obtained an extension of time until February 25,

---

[1] References to the transcript of the hearing are designated as "Tr. __."

2015 to file a reply, she did not do so.  With briefing complete, the undersigned now considers the merits of Defendant's motions.

**Facts**[2]

### I.     **Events of March 13, 2013**

On March 13, 2013, a confidential informant ("CI") told Hall County Sheriff's Office Investigator Jeffrey Shull that he knew where he could obtain methamphetamine.  (Tr. 52).  Shull brought the CI to the MANS unit and allowed him to make calls to order methamphetamine.  (*Id.*).  The CI spoke to a man named "Travis" in Jackson County, and Travis told the CI that he would have "Jared" deliver the methamphetamine to the CI to a particular Waffle House.  (Tr. 53).  Shull and the CI went to the location Travis described, and the CI then spoke with "Jared" by phone; Jared said "he was going to be arriving in a black car and would be arriving within a few minutes."  (Tr. 53-54).  Six to eight officers waited while parked in undercover cars at the Waffle House parking lot and at nearby businesses.  (Tr. 68-70).  The officers were all dressed in plain clothes and armed with sidearms.  (Tr. 69).  A black car, driven by Defendant, then pulled into the parking lot.  (Tr. 54).  Mr. Mullins was in the front passenger seat, and Mr. McDougal was in the rear passenger seat.  (*Id.*).  Mr. Mullins got out of the car and walked to the Waffle House, at which point the CI identified him as "Jared."  (*Id.*).

---

[2] These facts are taken from the July 25, 2014 hearing testimony and exhibits admitted during that hearing.

3

Shull waited for Mr. Mullins to return to the vehicle, and he then initiated a "take down" of the car and its occupants.  (*Id.*).  The agents, including Shull, moved in, blocked the vehicle and approached it while identifying themselves as law enforcement officers, removed the occupants and placed them on the ground, handcuffed them, patted them down, allowed them to stand up, and then detained them for investigation.  (Tr. 54-55, 70-71).  The occupants of the vehicle were not under arrest at that point, but they were not free to leave while the deputies conducted their investigation.  (Tr. 55).

Shull confirmed with Defendant that the vehicle was hers, asked whether there were any drugs or weapons in the vehicle, and asked for consent to search it, which she gave.[3]  (Tr. 55, 71-72; *see also* Gov't Ex. 5).  Shull used a calm, "regular tone of voice" in requesting Defendant's consent.  (Tr. 73).  Although the officers had initially drawn their weapons when approaching the car, they had holstered their weapons by the time Shull asked for Defendant's consent. (Tr. 73-74).  The deputies then searched the car.  (Tr. 58).  They did not find any methamphetamine, but they did find $502 in a woman's purse found behind the driver's seat, a cell phone between the two front seats, and a bag in the backseat that contained five cell phones.  (Tr. 59).  The deputies seized the cell phones. (*Id.*).  Defendant, who remained standing near the car during the search, did not

---

[3] Certain portions of the stop were recorded, including the portion where Shull asked Defendant for consent to search the vehicle.  (*See* Tr. 56-57; Gov't Ex. 5).

indicate that she withdrew her consent or tell the deputies to stop the search or limit the scope of the search.  (*Id.*).

Shull also asked Mr. Mullins if he had any drugs or weapons on his person and asked for consent to search his person, which he gave.  (Tr. 60).  Shull then searched him and found two bags of methamphetamine in his right front pocket, which Shull seized.  (Tr. 60-61).  Shull did not threaten or coerce Mr. Mullins to give his consent or tell him he would be arrested if he did not consent.  (*Id.*).  Shull questioned Mr. Mullins, who told him that he was going to Atlanta with Defendant, and they were supposed to pick up two ounces of methamphetamine. (Tr. 62).  Mr. Mullins also told Shull that Defendant had handed him the methamphetamine before pulling in to the parking lot or as they were pulling in, and her phone was used during the transaction.  (Tr. 63, 72).  Shull then decided to arrest Defendant.  (Tr. 63).

Shull read Defendant her *Miranda*[4] rights from a card and asked her if she understood her rights; she said she did, although she also indicated she did not understand why she was being arrested.  (Tr. 63-65; Gov't Ex. 5).  Shull explained that they had evidence of her involvement in a drug deal, and he started asking her questions, which she answered.[5]  (Tr. 65; Gov't Ex. 5).  Shull did not threaten

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[5] Shull's reading the *Miranda* rights and questioning of Defendant was recorded. (*See* Gov't Ex. 5).

Defendant or coerce her into responding to his questions, he did not make any promises in exchange for agreeing to be interviewed, and none of the officers had their weapons out while he advised her of her *Miranda* rights and questioned her. (Tr. 65-66, 74).

## II.   Events of October 1, 2013

Around midday on October 1, 2013, Jackson County Sheriff's Deputy Michael Stanifer was patrolling the area of Defendant's residence in Jackson County after receiving complaints of possible drug activity at her residence and of vehicles frequently traveling to that location throughout the day and night. (Tr. 10-11). He observed a car backing out of Defendant's driveway and pulling up to a stop sign, at which point he observed that the left brake light was out, in violation of Georgia traffic laws.[6] (Tr. 12). Stanifer observed two people in the car; he did not know that Defendant was driving the vehicle at that time. (Tr. 13-14). Stanifer decided to pull the driver over due to the broken tail light, so he followed the car to find a safe location to pull it over. (Tr. 14-15). He also activated his video recording equipment. (*Id.*; *see also* Gov't Ex. 3). He observed the passenger hanging out of the window, pointing to the top of the car and then pointing to the side of the road, so Stanifer turned on his blue lights to pull the car over. (Tr. 15).

---

[6] *See* O.C.G.A. §§ 40-8-25(b), 40-8-26.

The vehicle pulled over to the right, partially out of the roadway, and the passenger, identified as Mr. Fricky, got out of the car and approached Stanifer, at which point Stanifer instructed him to go back to the vehicle.   (Tr. 16, 18). Stanifer notified dispatch that he had initiated a traffic stop and gave his location. (Tr. 16).  Stanifer then exited the vehicle, and the driver, identified as Defendant, also got out of her car. (Tr. 16-17).  Stanifer knew that the driver was Ms. Maloch from taking a report from her the year before.  (Tr. 27).  She and the passenger appeared to be arguing, and Stanifer heard Defendant tell the passenger, "Don't say anything, just don't say anything." (Tr. 16-17).  Stanifer asked them what was going on, and the passenger said he wanted to get out of the vehicle, which was why he had been signaling to Stanifer to stop them.  (Tr. 17).

Stanifer asked Defendant for her driver's license, but after looking in her car for it, she said she did not have it with her.[7]  (*Id.*).  Because Stanifer observed tension between Defendant and Mr. Fricky, he put Mr. Fricky in his patrol car for their safety as well as his own, and Stanifer also had Defendant move her vehicle out of the road.  (Tr. 18).  He asked her if there was "anything" in the vehicle, and she said "she didn't know, it wasn't her vehicle." (*Id.*).  He asked her if she would allow the deputies to search it, and she said, "Yes, it is not my vehicle." (*Id.*). Deputy Herbert, who had arrived to assist Deputy Stanifer, began searching on the

---

[7]  He later found her license in her purse.  (Tr. 18).

passenger side, and Stanifer began searching on the driver's side.  (Tr. 18-20).

Defendant never withdrew her consent to search the car and never told the deputies

to stop the search.  (Tr. 21).  She also did not restrict the scope of her consent or

say anything that would cause the deputies to stop or limit their search.  (*Id.*).

During the search, the deputies found a pill bottle with the name "Clifton

Gooch" on it, and two different types of pills in Defendant's purse.  (Tr. 23, 25).

Deputy Stanifer asked Defendant whose pills they were, and she said "she thought

they were her mothers and they were just antibiotics."  (Tr. 22-23).  The deputies

also found another pill bottle with no label with four different types of pills in it,

under the left front corner of the passenger seat.  (Tr. 24, 26).  They also found a

white bottle with purple liquid in it under the seat. (Tr. 24).  Defendant and Mr.

Fricky said they did not know anything about the items found under the seat.  (*Id.*).

Deputy Stanifer did not know what the pills were, but Deputy Herbert believed one

was Lortab.  (*Id.*).  The deputies seized the items as evidence.  (Tr. 22; *see also*

Gov't Exs. 1, 2).  Deputy Herbert handcuffed Defendant, placed her under arrest

for possession of the controlled substances found in the pill bottles and for

possession of pills that were not in their original container,[8] and placed her in his

patrol car and transported her to the Jackson County Jail at 1:13 p.m.  (Tr. 23-25,

32-33; Def. Ex. 1).  Deputy Stanifer arrested Mr. Fricky, as well.  (Tr. 23).

---

[8] *See* O.C.G.A. § 16-13-75.

During the stop, Investigators Trey McConnell and David Larkin came to the scene. (Tr. 23, 29). Sometime around January 2013, Investigator McConnell had received information about drug activity at Defendant's residence, and "numerous people" had told him that she was involved in drug trafficking. (Tr. 36, 49). When he learned that Defendant had been stopped and drugs were found, he proceeded to the scene, arriving at 12:53. (Tr. 32, 37, 48; Def. Ex. 1). McConnell then learned that the deputies had searched the vehicle and found pills and some plastic baggies with designs on them. (Tr. 37). The baggies' design was significant to McConnell because in February, Defendant's nephew, Christopher Blake Johnson, was stopped after leaving Defendant's residence, and the deputies found a digital scale and methamphetamine, packaged in baggies with designs similar to those of the baggies found in the vehicle on October 1, 2013. (Tr. 38). McConnell also talked to Mr. Fricky, who "was very adamant that Ms. Maloch was the biggest drug dealer in Jackson County and that she had a whole lot of meth back at her residence." (*Id.*). McConnell was at the scene of Defendant's arrest for 10 to 15 minutes. (Tr. 45).

Based on what he learned at the scene and the information he already had about Defendant, McConnell decided to take additional steps to investigate. (Tr. 39). McConnell, Larkin, and some uniformed deputies went to Defendant's residence at 47 Kiley Drive and knocked on the door. (*Id.*). No one came to the

door, and they did not hear movement inside.  (*Id.*).  "Everything was boarded up," and the windows were covered so the deputies could not see inside the house.  (Tr. 46).  McConnell observed several video cameras around the house, which he has seen "probably a hundred times" as a narcotics investigator, "very common thing for people to have counter surveillance put up."  (Tr. 39).  McConnell testified that drug dealers put up such video monitoring "to protect themselves and their profits and to do counter surveillance on law enforcement so they can see if law enforcement is coming so they have time to discard  . . . any evidence of their illegal activities."  (Tr. 40).

After no one answered the door, a deputy stood in the driveway where he could observe the back door and the garage door for officer safety, and Investigator McConnell went back to his car and typed up a search warrant application on his laptop and e-mailed it to Investigator Dale Dillow.[9]  (Tr. 40-41).  Dillow presented the application to a Jackson County Magistrate Judge, who signed the warrant at 2:30.  (Tr. 40-42, 47; *see also* Gov't Ex. 6).  Dillow then called McConnell and told him that the judge had signed the warrant.  (Tr. 42).  Once Dillow arrived with the warrant, around 3 p.m., McConnell knocked on the door a few more times and announced "Sheriff's Office, search warrant" several times, but no one came to the door.  (Tr. 42-43, 47).  He did the same thing at the garage door.  (Tr. 43).  At that

---

[9]  No one had entered the residence at that point.  (Tr. 40).

point, the deputies forced their way into the house.  (*Id.*).  McConnell and the other deputies searched the residence and seized evidence, which they recorded on property receipt forms.  (Tr. 43; *see also* Gov't Ex. 4).

At some point during the search, Defendant's sister Kelly Wymore came to the house.[10]  (Tr. 47, 49-50).  The search warrant authorized the search of all persons, property, and vehicles located at Defendant's address, so when Defendant's sister drove on to the property, the deputies searched her and her vehicle pursuant to the authority of the warrant.  (Tr. 48; Gov't Ex. 6).  The officers did not find anything incriminating during those searches relating to Ms. Wymore.  (Tr. 48).

## Discussion

Defendant seeks to suppress any evidence seized on March 13, 2013 from her vehicle, statements she made to law enforcement officers on March 13, 2013, evidence seized from the vehicle she was driving on October 1, 2013, including from her purse, and evidence seized from her residence on October 1, 2013.  (*See* Doc. 33).

## I.     March 13, 2013 Vehicle Search

---

[10] Ms. Wymore testified that she arrived at approximately 1:30, at which point the deputies were already inside the house.  (*See* Tr. 77-78).  McConnell testified that Ms. Wymore arrived shortly before 3 p.m. (*see* Tr. 82-84), which would have been after Investigator Dillow obtained the search warrant at 2:30.  As discussed below, the undersigned credits McConnell's testimony on this point and finds that Ms. Wymore arrived after the deputies obtained the warrant authorizing the search.

Defendant contends that any evidence seized from her vehicle on March 13, 2013 must be suppressed because the deputies searched the vehicle without a warrant, and Defendant did not voluntarily consent to the search.  (Doc. 33 at 10-11).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. amend. IV.  Where a seizure is made without a warrant, the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment."  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

Here, the Government contends that Defendant voluntarily consented to the warrantless search of and seizure of items from her vehicle.  "[L]aw enforcement officers may search an individual's property without a warrant, as long as the individual voluntarily consents to the search."  *United States v. Brumfield*, 352 Fed. Appx. 366, 367 (11th Cir. 2009) (unpublished decision) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219-22 (1973)).  "Whether consent is voluntary is a fact question determined according to the totality of the circumstances," *Brumfield*, 352 Fed. Appx. at 367 (quotation omitted), and the government bears the burden of

proving the existence and voluntariness of the consent.  *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004).  The non-exclusive list of factors the court must consider in determining whether a consent was voluntary includes "[the] voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found."  *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984) (quoting *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981)); *see also United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996).  In *Gonzalez*, the Eleventh Circuit explained that "the absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that 'where there is coercion, there cannot be consent.' "  71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)).

Defendant contends that "the objective factors establish a reasonable person in [her] position would feel that, regardless of her consent, the vehicle was going to be searched."  (Doc. 33 at 10).  Defendant points to the fact that the deputies blocked her vehicle, pulled Defendant and the passengers from the car, placed

them on the ground[11], and handcuffed.  (*Id.* at 10-11).  Defendant asserts that "[t]he sheer number of officers, the fact they rushed the vehicle and pulled the occupants out without any warning conveyed the notion to Ms. Maloch that the agents were there to undertake an endeavor that did not involve her consent."  (*Id.*).  The undersigned disagrees.

Although the encounter was initially coercive, by the time Shull asked Defendant for consent to search her car, she was standing by the car, the deputies had re-holstered their weapons, and Shull spoke with her in a calm, professional manner, as Shull testified and as evidenced by the recording of the encounter.  (*See* Tr. 73-74; Gov't Ex. 5).  None of the deputies threatened or coerced Defendant or indicated in any way that she was required to consent to the search or that they would search the vehicle even if she did not consent.  (*See* Gov't Ex. 5). Moreover, Defendant never indicated at any time that she withdrew her consent or wanted the deputies to stop the search.  (Tr. 59; Gov't Ex. 5).

These circumstances are no more coercive than those found in other cases where the Eleventh Circuit held the consent to be voluntary.  In *United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993), for example, the court found defendant's consent to be voluntary even though he had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him

---

[11] Defendant asserts that deputies "threw her to the ground" (Doc. 33 at 10), but she did not cite to evidence that supports that allegation.

to the ground at gunpoint," and "he had invoked his right to remain silent before consenting to the search." *Id.* at 1571.  In *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989), the court found the defendant's post-arrest consent to search his residence was voluntary, even though fourteen agents were present when the defendant was arrested in his front yard; agents conducted a security sweep of his house; agents arrested him and led back into the house in handcuffs; and agents refused the defendant's conditional consent and requested to search the whole house "or else they would have to secure the house and apply for a search warrant." *Id.* at 357-62 and n. 4.

The undersigned finds that the Government has met its burden of proving that Defendant voluntarily consented to the deputies' search of her vehicle on March 13, 2013, and therefore, it is **RECOMMENDED** that Defendant's motion to suppress evidence seized during that search be **DENIED**.

## II.   Defendant's March 13, 2013 Statements

Defendant also moves to suppress evidence of any statements she made to law enforcement officers on March 13, 2013 following her arrest, on the ground that she did not knowingly and voluntarily waive her *Miranda* rights, i.e., her right to remain silent and to have an attorney present.  (*See* Doc. 33 at 8-9).

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  In *Miranda*, the Supreme Court held

15

that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Specifically, before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him. *Id*. at 467-73. Furthermore, "the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (internal quotation omitted). Such "waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered." *Id.* at 383. "The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Id.* "The prosecution therefore does not need to show that a waiver of *Miranda* rights was express." *Id.* at 384. "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Id.* "Where the prosecution shows that a *Miranda* warning was given and that it

was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.*

Here, it is undisputed that Defendant was under arrest and in custody when Investigator Shull questioned her.   The record further shows that before he questioned her, Shull advised Defendant of her *Miranda* rights, and he confirmed that she understood those rights.   (*See* Tr. 63-65; Gov't Ex. 5).   Although she did not explicitly state that she waived her rights, she did not invoke them either such as by stating that she wanted to remain silent or asking for an attorney.   Instead she voluntarily answered Shull's questions and did not indicate that she did not want to answer his questions, that she wanted the questioning to stop, or that she wanted an attorney present.   (*See* Tr. 65; Gov't Ex. 5).   Under these circumstances, the undersigned finds that Defendant knowingly waived her *Miranda* rights.   *See, e.g.*, *Berghuis*, 560 at 386 (finding that the defendant had impliedly waived his right to remain silent by answering the detective's question: "If Thompkins wanted to remain silent, he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation.").

The undersigned also finds that Defendant voluntarily waived her *Miranda* rights, and that her subsequent statements were made voluntarily and not "extracted by any sort of threats or violence, or obtained by any direct or implied

promises, or by the exertion of any improper influence." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989).   At the time Shull advised Defendant of her *Miranda* rights, confirmed that she understood those rights and began questioning her, Defendant was standing near the car, the deputies were not pointing their weapons at her, Shull spoke with her in a calm manner, and no one threatened her or made any promises in an attempt to coerce her to waive her *Miranda* rights and to respond to Shull's questions.   (*See* Tr. 63-66, 73-74; Gov't Ex. 5).   Thus, the Government has shown "that a *Miranda* warning was given and that it was understood by [Defendant]," and therefore, Defendant's "uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384.   Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress her March 13, 2013 statements be **DENIED**.

### III.   October 1, 2013 Search Of Defendant's Vehicle And Purse

Defendant argues that any evidence seized from the vehicle she was driving on October 1, 2013 must be suppressed because she did not believe that she had the ability to refuse consent since it was not her vehicle.  (Doc. 33 at 12-13).   She also contends that any evidence seized from her purse found in the vehicle must be suppressed because the search of her purse exceeded the scope of any consent given.  (*Id.* at 12).

The undersigned finds that Defendant voluntarily consented to the search of the vehicle.  Deputy Stanifer asked her for consent to search the vehicle, and she gave it.  (Tr. 18; Gov't Ex. 3).  The recording of the stop shows that Stanifer did not threaten or coerce Defendant to give her consent or indicate that she could not refuse consent, and no one was pointing any guns at her when Stanifer asked her for consent.  (*See* Gov't Ex. 3).

Defendant argues, however, that her statement to Stanifer that the vehicle was not hers indicates that she did not believe that she had the ability to withhold consent.  (Doc. 33 at 12-13).  The undersigned finds Defendant's assertion that the car was not hers to be immaterial to whether she knew she could refuse to allow the search or whether she voluntarily consented to the search.  Moreover, even if the deputies did not tell Defendant she could refuse consent, their "failure to advise [her] of [her] right to refuse consent will not invalidate an otherwise valid consent to search."  *United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1344 (N.D. Ga. 2014), *adopted by* 996 F. Supp. 2d 1321, 1326 (N.D. Ga. 2014).  Accordingly, the undersigned finds that Defendant voluntarily consented to the search of the vehicle she was driving on October 1, 2013.

The undersigned also finds that the deputies did not exceed the scope of Defendant's consent.  "A search may be unreasonable, even when an individual consents to that search, 'when an officer does not conform to the limitations

imposed by the person giving consent.' " *United States v. Baptiste*, 388 Fed. Appx. 876, 881 (11th Cir. 2010) (unpublished decision) (quoting *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999)). "When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search 'is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.' " *Zapata*, 180 F.3d at 1243 (quoting *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990)). "To ascertain what conduct is within the 'bounds of reasonableness,' we must consider what the parties knew to be the object (or objects) of the search." *Id.* "A general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items." *Id.* "The person who gave consent can also limit the scope of a search as it is occurring, or request that it be discontinued." *United States v. Garcia*, 284 Fed. Appx. 791, 795 (11th Cir. 2008) (unpublished decision)

Here, Deputy Stanifer asked Defendant if there was "anything" in the car, to which she responded that she did not know because the car was not hers. (Tr. 18; Gov't Ex. 3). He then asked her for consent to search the vehicle, and she gave her consent. (*Id.*). She did not limit the scope of her consent, nor did object when the deputies searched her purse, indicate that she had not given consent to search her purse, or indicate that the deputies should not search her purse. (*See* Tr. 21; Gov't

Ex. 3).   Under these circumstances, the undersigned finds that the deputies reasonably interpreted the scope of Defendant's consent to include the purse located in the car.  *See, e.g.*, *United States v. Harris*, 928 F.2d 1113, 1117-18 (11th Cir. 1991) (finding that the officer reasonably interpreted the scope of the defendant's consent to include the trunk of the vehicle and luggage contained therein, noting that the defendant "did not specifically limit the area that he could search," and "[m]ore importantly, [the defendant] was physically present while [the officer] searched the car, and had ample opportunity to limit the scope of the search, or request that it be discontinued" but did not do so); *United States v. Jarmillo*, No. 1:13-cr-00308-JEC-RGV, 2014 U.S. Dist. LEXIS 91027, at *41-42 n.25 (N.D. Ga. Apr. 25, 2014) (finding that officers did not exceed the scope of consent to search vehicle by searching locked luggage where the defendant "unlocked for them without objection or any attempt to revoke or limit his consent"), *adopted by* 2014 U.S. Dist. LEXIS 89752 (N.D. Ga. July 1, 2014).

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress evidence seized from the vehicle Defendant was driving on October 1, 2013, including any evidence seized from her purse found within the vehicle, be **DENIED**.

**IV.   October 1, 2014 Search Of Defendant's Residence**

Defendant contends that any evidence seized from her residence on October 1, 2014 must be suppressed because it was seized as a result of a warrantless entry into and search of her home.   The undersigned finds otherwise.   The credible evidence shows the following: Investigator McConnell arrived at the scene of Defendant's arrest at 12:53 and left 10 to 15 minutes later to go to Defendant's house (located approximately a quarter mile from where the traffic stop occurred[12]), that he knocked on the door of Defendant's residence and attempted to make contact with any occupants therein, and he and Investigator Dillow then applied for and obtained a search warrant authorizing the search of Defendant's house, signed by a magistrate judge at 2:30 p.m.   (*See* Tr. 32, 37, 39-42, 45, 47-48, 88; Gov't Ex. 6; Def. Ex. 1).   Investigator McConnell also testified repeatedly and credibly that the deputies did not enter and search the home until after the magistrate judge signed the search warrant.   (*See* Tr. 42-43, 50, 89).   The

---

[12] Defendant asserts that Investigator McConnell "testified that he arrived at Ms. Maloch's residence at 2:17 p.m. on October 1, 2013," and therefore, he did not have time to type up a warrant application and have it signed by 2:30.   (Doc. 33 at 5-7, 14-15 and n. 5 & 7).   Although McConnell initially testified that the 9-1-1 dispatch center record shows that he arrived at Defendant's residence at 2:17 p.m. (Tr. 82, 85), he then clarified that that record shows the time *Deputy* Herbert arrived, not McConnell (*see* Tr. 87).   Instead, McConnell testified that he is not sure what time he arrived at the residence because it was not his practice then to radio in to dispatch when he arrived at a location, but he would have arrived at the residence shortly after he left the traffic stop, located only a quarter mile from Defendant's house.   (*See* Tr. 87-89).

undersigned acknowledges that Defendant's sister Kelly Wymore testified that she arrived at the house around 1:30 p.m., at which time deputies were already in the house conducting the search, but the undersigned credits Investigator McConnell's testimony that the search was not conducted until after the search warrant was obtained at 2:30.   Ms. Wymore's testimony was not corroborated by any other witness or documents, even though the undersigned gave Defendant the opportunity to supplement the record by producing cell phone records that might have lent some support to Ms. Wymore's testimony about phone calls she made around the time she went to Defendant's house.  (*See* Tr. 76-80, 89).  Regardless of whether Ms. Wymore was simply mistaken about the time she arrived at her sister's house almost 10 months before the July 25, 2014 hearing, or whether her testimony may have been motivated by a desire to help her sister, the undersigned finds her testimony as to the time she arrived at Defendant's house to be less credible than Investigator McConnell's.

The undersigned also notes that Investigator McConnell testified at the hearing that the dispatch center informed him that its records show that Ms. Wymore's driver's license was called into dispatch at 3:03 p.m. (Tr. 87), which is consistent with her being present at the residence after the deputies obtained the search warrant at 2:30, and inconsistent with her testimony that she arrived at 1:30 and left the residence around 30 minutes later.  (*See* Tr. 77-78).  The undersigned

held the record open for the Government to provide the CAD report concerning the

deputies' activities at Defendant's house on March 13, 2013.  (*See* Tr.  84, 89).

The Government filed that report and Investigator McConnell's supplemental

report which show that, as McConnell testified, Ms. Wymore's driver's license

was checked at 3:03, after the search warrant was issued and well after the time she

testified she was at Defendant's house.  (*See* Docs. 26-1, 26-2).  Defendant did not

object to the Court holding the record open for the purpose of submitting the CAD

report (*see* Tr. 89-90), nor did she object to the Government's filing of

McConnell's supplemental report and the CAD report (*see* Doc. 26 at 1; Doc. 33 at

16 n.8).   Nevertheless, Defendant now "objects to this Court relying on the

supplemental report of Inv. McConnell or the CAD report submitted after the

hearing" without holding a hearing and allowing Defendant to cross-examine

McConnell and subpoena other witnesses.[13]  (Doc. 33 at 16 n.8).  Such a hearing is

unnecessary because, even in the absence of Investigator McConnell's

supplemental report and the CAD report submitted after the hearing, the

---

[13] Defendant's objection to the Court's consideration of these reports and her
request for a hearing are somewhat puzzling given the Government's
representations in its August 27, 2014 filing that "[r]ather than reopening the
evidence and taking live testimony from Investigator McConnell . . ., the parties
stipulate and agree that [McConnell's supplemental report and the CAD report]
become part of the evidentiary report for the motion to suppress and may be relied
upon by the parties in briefing the issues raised by defendant in her motion and by
the Court in resolving those issues."  (Doc. 26 at 2).  Defendant did not object to
those representations or inform the Court that she did not so stipulate.

undersigned finds McConnell's hearing testimony to be more credible than Ms. Wymore's, and finds that the deputies did not begin searching Defendant's residence until after they obtained a search warrant.

Accordingly, because the deputies searched Defendant's residence pursuant to a search warrant authorizing that search, it is **RECOMMENDED** that Defendant's motion to suppress evidence seized from her residence on October 1, 2013 be **DENIED**.

### Summary

For the foregoing reasons, it is **RECOMMENDED** that Defendant's motions to suppress (Docs. 17, 18) be **DENIED**.

It is further **ORDERED** that subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial**.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED & ORDERED** this <u>25th</u> day of <u>March</u>, 2015.

 /s/ *J. CLAY FULLER*
J. CLAY FULLER
United States Magistrate Judge